[Cite as *Wallen v. Cryder*, 2019-Ohio-2945.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| KELLI WALLEN, et al. | : | |
| | : | |
| Plaintiff-Appellant | : | Appellate Case No. 28232 |
| | : | |
| v. | : | Trial Court Case No. 2018-CVR-700 |
| | : | |
| RON CRYDER | : | (Criminal Appeal from |
| | : | Municipal Court) |
| Defendant-Appellee | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 19th day of July, 2019.

. . . . . . . . . . .

KELLI WALLEN, P.O. Box 752266, Dayton, Ohio 45475
　　　Plaintiff-Appellant, Pro Se

RON CRYDER, 15659 Schoolhouse Road, Brookville, Ohio 45309
　　　Defendant-Appellee, Pro Se

. . . . . . . . . . . .

DONOVAN, J.

{¶ 1} Kelli Wallen and Donovan Baker ("the tenants") appeal from the November 1, 2018 order of the Municipal Court of Montgomery County, Western Division, which ordered rent money that had been held in escrow be returned to Ron Cryder, their landlord. For the following reasons, the judgment of the muicipal court will be affirmed.

{¶ 2} On May 31, 2018, the tenants filed an application to deposit rent in escrow, which stated that the rent due under their rental agreement was current for their Denlinger Road address and that rent is due on the first of each month in the amount of $800. At the bottom of the application was a "Notice to Landlord or Agent" that a rental payment was deposited in the municipal court clerk's office on May 31, 2018. The record reflects that the tenants also deposited $800 in escrow on June 29, 2018.

{¶ 3} A hearing on the application was scheduled for July 5, 2018. The record before us contains the exhibits from that hearing, but not the transcript. According to the municipal court's July 10, 2018 entry, both parties appeared pro se at the hearing. The municipal court granted the tenants' application to deposit rent in escrow, stating: "Rent is abated, per lease between parties, until repair work is accomplished."

{¶ 4} On July 16, 2018, the municipal court clerk filed a copy of a July 12, 2018 email message sent by Cryder to the clerk. The email stated: "Repairs have been completed and I request a hearing to be set to review[.]"

{¶ 5} A hearing was held on August 16, 2018, and the record contains a transcript of that hearing, at which the following exchange occurred:

THE COURT: * * * So we have a rent escrow case and we have an eviction. Mr. Cryder, have you talked to an attorney about this?

MR. CRYDER: No.

THE COURT: You know you can't evict somebody when you're in the middle of a rent escrow case?

MR. CRYDER: No, I did not know that.

* * *

THE COURT: * * * But apparently part of why we're here, Mr. Cryder, is because you say you've repaired everything; is that right?

MR. CRYDER: Yes, sir.

* * *

THE COURT: * * * Do you folks agree that he's fixed everything?

MS. WALLEN: No, we do not.

THE COURT: * * * Let's talk about that then. Yeah. So the, the forceful entry and detainer case set for today is going to be dismissed. I mean, you may be able to refile it, but you can't file this while there's a rent escrow in process. Okay?

MR. CRYDER: I thought the rent escrow ended at the first of the month.

THE COURT: No. The rent escrow continues until the Court's satisfied that the repairs have been made.

MR. CRYDER: But I understand they didn't put money in escrow this month.

THE COURT: Because you abated the rent. You gave up the rent until the repairs were accomplished. That was in your lease.

MR. CRYDER: * * * Well, the repairs were made. I don't know the

exact date - -

* * *

MR. CRYDER: - - but the repairs were made like right after we got out (unintelligible).

THE COURT: * * * So what do we have here?   We have something from JFK Heating and Cooling. It's a bill for 1350. Install flue liner.

* * *

THE COURT: * * * Do you folks dispute the fact that the flue liner was installed per this receipt?

MS. WALLEN: No, sir.

* * *

MS. WALLEN:   What I dispute is that the full repairs were completed.

THE COURT:   * * * Now, let's go back then. Now we have a plumbing call here. Replace drain pipe in the basement at the bottom of the waste stack. Cut out, clean out tree tee fittings and replace new PVC fittings. Connect the cast iron with new mission bands. Was that accomplished?

MS. WALLEN: Yes, sir.

THE COURT:   * * * Now, we have before pictures of the - - it looks like the bathroom and certain areas of the house.   And now we have some after pictures. So they've - - you acknowledge that these pictures are accurate as to what's been done so far?

MS. WALLEN:   As of the date that he was in our home, yes.

THE COURT:   What date was that, ma'am?

MS. WALLEN: * * * July 7th.

THE COURT:   * * * So those * * * things have been accomplished as far as we know?

MS. WALLEN:   Yes, sir.

{¶ 6}   When the court asked Wallen what else needed to be repaired, she testified that she provided Cryder with a list of repairs and he "left it at my home and told me that it was too complex of a list."   She stated that she had "photos as of this morning" to show that his attempted repairs were not complete.   According to Wallen, there was still mold in the bathroom and paint cracking and falling through the bathroom "because he did not complete the repairs.   All he did was scrape off what was already loose and hanging and then throw primer on top of it."   Wallen further stated that, "[a]s far as the center wall over the fireplace chimney, all he did was, again, scrape off what was loose and then put primer over the top of it."

{¶ 7} Wallen further stated that she had the estimate from the chimney sweeps that Cryder "sent out to estimate the damages originally way back in April"; the estimate, which was sent to Wallen because the chimney sweeps could not reach Cryder, stated "that there was water being held in the mortar around the chimney and also that there was moss growing."   She testified that Cryder had "chosen not to remove that area that was contaminated by the water and the moss growing.   He just put primer over top of it."

{¶ 8}   Cryder responded that "everything we talked about on the court date has been completed."   He stated that the bathroom at issue has no windows and a ceiling fan.   He stated that he told the tenants that they would "have to keep that area with the

air circulating, let that stuff dry" after showering. As far as the mold and moss in the chimney, Cryder said that, when he had "that company come out and do the chimney repairs, they said that would * * * stop the moisture from growing in the chimney."

{¶ 9} Wallen responded that there was still mold showing through Cryder's primer and still mold on the walls, and that "[t]here's now paint falling and cracking through the primer that he put on."

{¶ 10} In response to a question from the court, Wallen indicated that the lease was month-to-month by the time of the hearing and that the tenants were trying to find another place to live. She stated that "it is difficult because I have three adults, one of which is a disabled child * * *." She testified as follows:

I have photos that are taken as of this morning where you can clearly see the mold. * * * [T]here's a picture in the dining room where he never even addressed where the water had been pouring through the ceiling above the closet in the dining room.

And then the center walls of the house where the furnace was you can still see where the moss and mold are growing and where he did not scrape off all the old paint nor remove the - - whatever liner that was holding the - - retaining the water.

{¶ 11} Cryder stated that the list of necessary repairs was "too big" and that he "needed specifics" as to where there were problems. Cryder said he had asked Wallen for "a new list" to show him where all the problems were, and she failed to do that. Cryder stated that the only problems he was aware of were "a chimney area and the bathroom ceiling," and those problems were fixed. Wallen indicated that a printout of text

messages between her and Cryder showed that Cryder was "very well aware of exactly where the issues are."

{¶ 12} The court reviewed Wallen's list of "Necessary Repairs" and indicated to Cryder that it seemed to be pretty clear what needed to be done in the house. "If, if they're that extensive that you can't figure out which leaks she's talking about, it seems to be quite a bit of problems here." The court further noted that the purpose of a rent escrow case "is to make the house habitable and try to give the parties what they bargained for in terms of the lease but more importantly is to make sure that it's safe and habitable for both."

{¶ 13} The following exchange occurred:

MR. CRYDER: Sir, I haven't had a chance to look at * * * those lists that she's written.

THE COURT: Oh, well, this is the one you saw before. Apparently that's the same list * * * she supplied before.

Where is this leak coming from, the bathroom or from outside the - - the rain outside the house?

MS. WALLEN: The center wall had a leak outside of the home. That was from the furnace being basically (unintelligible). He updated the furnace and didn't update the chimney.

The leak in the bathroom, I'm not really sure. It holds moisture from the shower, but it also presents moisture when no one's using any water in that room at all.

* * *

MS. WALLEN: And then the water damage in the dining room abo[ve] the closet came from when the plumbing backed up and it backed up into the toilet upstairs and then poured down through the floor into our dining room above the closet.

THE COURT: * * * Well, sir, it doesn't look to me like you've got it -- you've got it nailed here yet to the point where the escrow can be dismissed. The escrow continues for your edification, sir, until the repairs are made and the property is habitable again. Okay?

MR. CRYDER: Okay. But - -

THE COURT: Again, by your lease, you have agreed to abate the rent if it's by your doing rather than theirs until the repairs are accomplished.

MR. CRYDER: But that's if the property is uninhabitable * * * correct?

But they are living there so it's not uninhabitable if they're able to live there.

THE COURT: Well, I'm not going to debate it. It's not true what you said, but yeah, you're wrong.

So the bottom line is we're going to continue the escrow until the repairs are completed as it stands now, basically the decision from July 5th.

And we're going to dismiss the forceful entry and detainer because we have a pending, rent escrow case that does not allow that to be filed.

* * *

MR. CRYDER: Sir, can I point this out again?

Let's see. There is a clause in the lease that we looked at before. That's designed for in case of a fire or major damage that the property cannot be occupied - -

\* \* \*

MR. CRYDER: - - that the rent is abated if they are not able to live there. But they are able to live there because they are still living there.

THE COURT: Well, let's see. You interpreted it that way last time. It says use of premises.

MR. CRYDER: It would be Item Number 16.

THE COURT: Oh, damage to the premises. If the demised premises shall be partially damaged by fire or other natural casualty.

Well, wouldn't water leaking in being [sic] a natural casualty?

MR. CRYDER: Yes, but there is no water leaking in. It's all been - - it's all been repaired as you can see by the, the plumbing receipts and the chimney repair.

THE COURT: Well, she says it's not. It's still leaking.

MS. WALLEN: The chimney doesn't appear to be no longer leaking, but he has never repaired the damage from such a leak.

\* \* \*

MR. CRYDER: But, sir, the photos that you have show the damages have been repaired.

THE COURT: Well, it seems to me, sir, you've kind of let your property go, and it needs to have a general - - you still need to bring it up to

speed so these folks can live there.

THE COURT: But they are living there, sir. That's my point. They are living there.

THE COURT: Yes, and I've made my choice. And the hearing is over. And we'll continue the escrow.

Folks, you've got 30 days to find a place and move out.

MS. WALLEN: Yes, sir.

THE COURT: I'm not going to leave you there indefinitely.

MS. WALLEN: No. We have (unintelligible) notice.

THE COURT: * * * Good. Hand it to him.

Sir, they're telling you that in 45 days they're going to be gone anyway so we'll see what happens in the meantime. * * *

{¶ 14} On October 3, 2018, correspondence from Wallen was filed requesting a final hearing and indicating that the tenants vacated the property on September 13, 2018, and made the property available to Cryder on September 30, 2018.

{¶ 15} The court scheduled a hearing for October 22, 2018. The transcript reflects that Wallen asked that the escrow be terminated and the escrowed funds be returned to the tenants. The following exchange occurred:

THE COURT: * * * [W]hy don't you tell us what your position is on this?

MR. CRYDER: * * * Again, I - - any time they requested repairs, they were completed. The problem * * * with the discoloration on the chimney was, was due to a bad chimney. I've had that - - I had that

replaced - -

* * *

MR. CRYDER: - - with a flue liner. And I asked them to keep an eye on it and let me know if it leaked anymore.

* * *

MR. CRYDER: So then we went ahead and came to court. And like I say, I got those repairs finished on the - - on July 8th.

And then, like I said, we had a property showing on 8-23 that they didn't - - wouldn't allow us in. We had to have the police show up to allow us to get into the - - into the house.

And while I was there I took some photos of the repairs that she said was still, still problems, and there's photos here that shows pretty much the same condition as when I repaired it the first time which was when it was completed.

I took some photos after they moved out on October 2nd of the same areas, and there's no difference between any of the damaged areas from the time I repaired it until - - well, even - - even I was there yesterday and there was still no change in this thing.

She claimed that there was - - that the problem had not been fixed, and these photos hopefully show that they have been.

* * *

THE COURT: * * * Why don't you show those to the Plaintiffs?

Take a look at those. Mr. Cryder says his pictures show that the

problems have been solved and that they were solved at the last time we had a hearing on July 5th.

\* \* \*

THE COURT:   What response do the Plaintiffs have?

MS. WALLEN:   The first time we came to court I submitted 99 photographs of the issues.   Then he came through and said he fixed everything, but all he did was he came in that Saturday and scraped off just the very stuff that was just loose.   He did not scrape off the actual layer that was peeling on any of the interior walls or in the bathroom.

Then he applied one coat [of] Kilz to it, and then he said that it was resolved.

When we came back to court because he was saying that I owed him rent, even though rent was currently in escrow - - and if you recall last time we were here he was asking for my eviction for failure to pay rent even though rent was in escrow - - I brought in pictures at that time that showed that, you know, even evident by his pictures, some of them - - although I actually brought in photographs, not just printed so they were a little clearer - - you could see that he just applied one layer of Kilz, that there was still mold visible in the bathroom, still falling paint upstairs in the main hall - - in the main wall.

And I have a video here where we did an entire walk-through the day that we were leaving that, and I - - there are parts in here where you can see all the areas in question.

And I also have printouts from him where, you know, just our texts and stuff basically saying that we're out and he wasn't asking for anything other than he was saying something about some weeds or something which were part of a big giant hedge that we had already told him we could not - - we did not have the proper equipment to cut down. And since he didn't provide us with any outside storage room to have those kind of tools or anything, we had no way to do it. And so he has been taking care of that.

* * *

THE COURT: * * * We'll take a look at the pictures and we'll make a decision. * * * [Y]ou should have a decision within 21 days, and that concludes this hearing.

{¶ 16} Cryder submitted printed copies of photos taken by him of the premises on July 8, 2018, August 23, 2018, and October 2, 2018. Wallen submitted a DVD depicting her final walk-through of the premises.

{¶ 17} The municipal court's November 1, 2018 entry provides as follows:

* * * After a hearing on the merits of the case where both parties participated and after reviewing all of the pictures and the CD ROM pictures submitted by the Plaintiff, the Court finds that the Defendant has made significant progress to address the issues present. The plaintiffs have resided in the premises since the filing of the Escrow on May 31, 2018.

The court finds for Defendant and the escrowed funds shall be release[d] to the Defendant.

{¶ 18} The record reflects that a check in the amount of $1,584 was issued to

Cryder from the municipal court on November 1, 2018.

{¶ 19} Before addressing the assigned error, we note that the tenants filed their notice of appeal on December 13, 2018, and their brief on February 19, 2019. On March 27, 2019, this Court ordered Cryder to file a brief or show cause why this matter should not be submitted to the court and considered on the merits without his brief. On April 9, 2019, Cryder requested an extension of time "to file required documents"; this Court gave him until April 30, 2019, to file a brief. On April 29, Cryder filed "Statement of Facts" and a timeline of events related to the Denlinger Road address, beginning July 12, 2016 and ending April 12, 2019, as "required by court." On May 10, 2019, Cryder filed a "brief and timeline as a true representation of the facts."

{¶ 20} In their pro se brief, the tenants assert the following assignment of error:

THE TRIAL COURT ERRED BY GOING AGAINST [ITS] OWN PRIOR RULINGS, IN JULY AND AUGUST OF 2018, AND STATING THE DEFENDANT HAD "MADE SIGNIFICANT PROGRESS TO ADDRESS THE ISSUES PRESENT."

{¶ 21} The tenants assert that their complaint was "related to water from external and internal sources which were also causing mold and moss issues, leading to unsanitary living conditions." They assert that, considering the court's prior rulings, including its "attention to item 16 in the rental agreement" related to damage to premises, and its prior holding that Cryder's chimney liner replacement and plumbing repair in the basement had been insufficient to address all the problems and to terminate the escrow arrangement, they "cannot understand" how, with Cryder having done "absolutely nothing in the interim," the municipal court could have terminated the escrow and

abatement and awarded the full amount in escrow to Cryder.

{¶ 22} R.C. 5321.07, pursuant to which the tenants applied to deposit their rent in escrow, provides:

(A) If a landlord fails to fulfill any obligation imposed upon him by section 5321.04 of the Revised Code, other than the obligation specified in division (A)(9) of that section, or any obligation imposed upon him by the rental agreement, if the conditions of the residential premises are such that the tenant reasonably believes that a landlord has failed to fulfill any such obligations, * * * the tenant may give notice in writing to the landlord, specifying the acts, omissions, or code violations that constitute noncompliance. * * *

(B) If a landlord receives the notice described in division (A) of this section and after receipt of the notice fails to remedy the condition within a reasonable time considering the severity of the condition and the time necessary to remedy it, or within thirty days, whichever is sooner, and if the tenant is current in rent payments due under the rental agreement, the tenant may do one of the following:

(1) Deposit all rent that is due and thereafter becomes due the landlord with the clerk of the municipal court or county court having jurisdiction in the territory where the residential premises are located.

* * *

(C) This section does not apply to any landlord who is a party to rental agreements that cover three or fewer dwelling units and who provides notice

of that fact in a written rental agreement * * *.

**{¶ 23}** In the section of the application to deposit rent in escrow, the tenants indicated that they were not supplied with a notice in writing that the landlord was a party to rental agreements that cover three or fewer dwelling units.

**{¶ 24}** The Residential Lease for the Denlinger address provided in part:

**16. Damage to Premises**. If the demised premises, or any part thereof, shall be partially damaged by fire or other natural casualty due to Lessee's negligence or willful act or that of his employee, family, agent, or visitor, the premises shall be promptly repaired by Lessor and there shall be an abatement of rent corresponding with the time during which, and the extent to which, the leased premises may have been untenable; but, if the leased premises should be damaged by Lessee's negligence or willful act or that of his employee, family, agent, or visitor to the extent that Lessor shall decide not to rebuild or repair, the term of this lease shall end.

**{¶ 25}** We have reviewed the text messages submitted by Wallen at the July hearing, the timeline of events and fact statement submitted by Cryder, and all the photos and the DVD. They reflect the following sequence of events:

● On April 2, 2018, Wallen texted Cryder: "Ron, I will have the rent by tomorrow. We now have mold on that chimney wall, though. I've been taking pics and complaining about water damage since we moved in. It's now affecting our health. I need this done with ASAP!" Waller texted a photo of dark spots on a wall in the home.

● On the same date, Cryder's timeline of events reflects that he contacted Abbey

Road Chimney Sweeps about chimney repair.

● The receipt from Abbey Road Chimney Sweeps, Inc. is dated April 5, 2018. It provides: "Needed repairs are stainless steel liner or furnace flue and water treat small chimney. To make both masonry fireplaces operable they would need a heatshield or stainless steel liner. On the large chimney the exterior is holding moss. It is recommended that neither fireplace be used till relined in some fashion."

● Cryder's timeline of events reflects the following in "April 2017": "Tar Patch Chimney (unknown month or date, was completed because chimney had moisture in house and I thought chimney had cracks)."

● On April 13, 2018, Wallen texted Cryder: "You never called me about repairing the walls, Ron. Like I said, we can't stay there with it like that. * * *."

● On the same day, Cryder texted Wallen: "Planning on Sunday starting Sunday morning depends on the weather maybe even start to tomorrow."

● Cryder's timeline of events reflects the following for the date of April 14, 2018: "Scrape Chimney walls, main and second floor, clean with bleach."

● On April 19, 2018 Cryder texted Wallen: "I talked to them that put furnace and he can do flu liner maybe this afternoon call me."

● Five minutes later on the same day, Cryder texted Wallen: "People that put furnace in can do the flu liner today between 1 and 2 if you could please call as soon as you can if you're going to be home or not thanks."

● Cryder's timeline of events reflects the following for April 19, 2018: "JFK will be there between 1&2 PM to install Flue liner. $1350. Wallen would not allow Access

to house."

● Cryder's timeline of events reflects the following for April 23, 2018: "Met JFK at house for chimney repair."

● The JFK receipt for $1,350 was submitted at the August hearing.

● On May 11, 2018, Waller texted Cryder: "Woke up to our ceiling raining over the dining room closet.  Trying to track down the source but you will need to fix it, today.  Just letting you know."  Cryder's timeline of events for the same day reflects that he was notified of the leak.

● On May 13, 2018, Wallen texted Cryder: "This is the cause of our leak upstairs, which you haven't responded to.  We are down to 1 bathroom for 3 adults, for the third day in a row.  This is completely unacceptable.  The lease states this is your responsibility as it traces back to a repair you patched with duct tape, before we ever moved in.  You either need to fix it within the next 24 hours or we will deduct the cost for a plumber, the pipe, and all other necessary repairs from future rent. I do not appreciate the lack of response to this issue."  Wallen attached a photo of a cracked basement pipe with duct tape hanging from it.

● On the same day, Cryder texted Wallen: "Where is this pipe basement or upstairs and is it a half or three quarter inch."

● On the same day, Wallen texted Cryder: "It's the main drain in the basement. You can come look right now"  Cryder responded: "Okay be over a bit."

● Cryder's timeline of events reflects the following for the same day: "Looked at plumbing leak – turns out to be a clogged sewer line for upstairs toilet."

● Cryder's timeline of events reflects the following for May 14, 2018: "Received bid

from Pester Plumbing to repair basement sewer line for $439."

● Cryder's timeline of events for May 17, 2018 provides: "Wallen stated they ran a snake thru plumbing line."

● On May 22, 2018, Cryder's timeline of events reflects the following: "Advised Wallen drain issue is their responsibility."

● On the same date, Wallen texted Cryder: "Ron, it's really simple.   You need to have someone come replace the pipe in the basement.   That is the problem.   If you don't have it done in the next 36 hours, I'm calling Trotwood and Montgomery County and reporting the unbelievable conditions due to the bathroom and the raw sewage in the basement.   I will also put the rent in escrow.   I'm done screwing around.   It's been 11 days."

● On the same date, Cryder texted Wallen: "The drains worked all the time you live there you had a clogged [sic] which is your responsibility to repair."

● On the same date, Wallen texted Cryder in part: "* * * The clog is in the basement, right by your busted pipe, which is leaking sewage into the basement. * * * We rented a 25 foot snake.   It didn't reach the clog.   We rented a 50 snake. IT didn't reach the clog.   That's when we went exploring and found the MAJOR pre-existing issue in the basement.   I've read the lease.   It says if it's caused by us and not a major repair, it's on us.   If it's not it's on you.   Guess what?   It's on you."

● On June 7, 2018, Cryder texted Wallen: "did plumbing company call you for today?"

● On the same day Wallen texted "Yes. They're here, working" and "Thank you.   I appreciate you getting it fixed."

● As noted above, at the August hearing, the court reviewed an invoice dated June 22, 2018 from A and L Plumbing, Inc. that stated that the broken basement pipe was replaced.

● Cryder's timeline of events for July 7, 2018 provided: "Work on chimney walls and bath ceiling, scrape, clean, patch" and "chimney and down bath before photos"

● Cryder's timeline of events for July 8, 2018 provides: "Kilz Prime bath ceiling down, and chimney" and "chimney and down bath after photos"

{¶ 26} We note that Wallen's list of "Necessary Repairs" that was admitted at the August hearing was as follows:

Stop all water leaking into home

Remove all current and previously wet areas of wall, ceilings, flooring, etc.

Remove all traces of mold from house

Plaster, drywall, etc[.] + paint areas that have been affected

Repair cracks in walls and ceilings

Clean residue from plumbing issue in basement

Make necessary repairs to stop plumbing leaks in bathrooms and kitchen

that do not fall under tenant responsibility.

{¶ 27}  It is clear from the evidence that Cryder installed a flue liner, replaced the broken section of drain pipe in the basement, and scraped and primed areas in the home containing water damage. Cryder's "before" and "after" photographs of the damaged areas reflect significant repairs.  In her September 30, 2018 final walk-through, Wallen filmed every room in the home.  The limited areas that sustained water damage appeared to have been scraped and primed, although the plaster was not resurfaced

evenly. We conclude, however, that such cosmetic issues did not render the home untenable. We agree with the municipal court that Cryder made significant progress in addressing the repairs, and that he was entitled to the release of the escrowed funds. Accordingly, the tenants' assigned error is overruled, and the judgment of the municipal court is affirmed.

. . . . . . . . . . . .

WELBAUM, P.J. and HALL, J., concur.

Copies sent to:

Kelli Wallen
Donovan Baker
Ron Cryder
Hon. James D. Piergies